UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

In re:                                                    CHAPTER 11
                                                          Case Nos. 02-16212 (ALG)
ACTRADE FINANCIAL                                         and 02-16213 (ALG)
TECHNOLOGIES LTD., et al.                                 (Jointly Administered)


                              Debtor.

---------------------------------------------------------x

KENNETH P. SILVERMAN as Chapter 7 Trustee
of Allou Distributors, Inc., et al.


                              Plaintiff,


          -against-                                       Adv. Proc. No. 04-03601 (ALG)


ACTRADE CAPITAL, INC. and
THE ACTRADE LIQUIDATION TRUST


                              Defendants.

---------------------------------------------------------x

## MEMORANDUM OF OPINION

**APPEARANCES**

SILVERMAN PERLSTEIN & ACAMPORA LLP
Attorneys for Kenneth P. Silverman, Esq.,
Chapter 7 Trustee of Creditor Allou Distributors, Inc.
100 Jericho Quadrangle, Suite 300
Jericho, New York 11753
          By:    Edward M. Flint, Esq.
                 Ronald J. Friedman, Esq.


BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
60 East 42nd Street, Suite 4600
New York, New York 10165
          By:    Neil D. Grossman, Esq.
                 Edward N. Gewirtz, Esq.
                 Peretz Bronstein, Esq.
                 Noson A. Kopel, Esq.
                 Laura S. Mello, Esq.

-and-

SCHLAM STONE & DOLAN, LLP
26 Broadway, Floor 19
New York, New York 10004
    By:  Bennette D. Kramer, Esq.
        Jeffrey M. Eilander, Esq.
Attorneys for Actrade Capital, Inc., and The Actrade Liquidation Trust

**ALLAN L. GROPPER**
**UNITED STATES BANKRUPTCY JUDGE**

## INTRODUCTION

Actrade Financial Technologies Ltd. and Actrade Capital, Inc., (together, "Actrade" or the "Debtor") filed for relief under Chapter 11 of the Bankruptcy Code on December 12, 2002 and confirmed a Joint Plan of Liquidation (the "Plan") on January 7, 2004. Under the Plan, they propose to pay all creditors in full and to make a substantial distribution to equity holders, with one significant caveat. The Liquidating Trustee (the "Trustee") of Allou Distributors, Inc. ("Allou"), a company in Chapter 7 liquidation in the Eastern District of New York, has filed a $48 million claim in the Actrade case in which he asserts that Actrade was the recipient of fraudulent conveyances under the Bankruptcy Code and under applicable State law, the New York Debtor & Creditor Law ("DCL"). The Allou claim is one of the last substantial unresolved claims in the Actrade case.

Actrade objected to the Allou Trustee's claim, and with the parties' agreement the Allou claim was procedurally formulated as an adversary complaint filed in the *Actrade* case by the Allou Trustee. Actrade has now moved to dismiss the Trustee's amended complaint (the "Complaint") on the grounds that the Trustee has failed to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6) and has failed to plead

fraud with the specificity required by Fed. R. Civ. P. 9(b).  For the reasons set forth

below, Actrade's motion to dismiss is granted in part and denied in part.

## FACTS

## THE FACTS AS ALLEGED IN THE COMPLAINT

The following facts alleged in the Complaint, presented in the light most

favorable to the plaintiff, are assumed to be true for purposes of this motion.

### I.    The Allou Fraud

Prior to its bankruptcy, Allou purported to be a nationwide distributor of health

and beauty aids, pharmaceuticals, fragrances and cosmetics.  (Compl. at ¶ 8.)  To finance

its operations, Allou entered into an asset-based credit facility with Congress Financial

Corp. ("Congress") with a credit line of up to $200 million (the "Loan Agreement").

(Compl. at ¶ 20.)  The credit available to Allou under the Loan Agreement was calculated

on a daily basis as, roughly, 85% of Allou's eligible accounts receivable plus 60% of

Allou's eligible inventory, and Allou was required to regularly certify its inventory and

accounts receivable by providing collateral reports to its lender.  *Id.*  As of March 2003,

Allou had outstanding advances totaling approximately $195 million under the Loan

Agreement.  *Id.*

In or about March 2003 it was discovered that Allou had been fraudulently

inflating inventory and accounts receivable in its collateral reports in order to artificially

inflate its borrowing base.  (Compl. at ¶ 21.)  While the full extent of the Allou fraud

remains unknown, the Trustee alleges that the fraudulent scheme had been ongoing since

at least the mid-1990's and that it increased in magnitude and scope over the years.

(Compl. at ¶ 22.)  The Allou Trustee alleges, among other things, that Allou, under the

control of the Jacobs family, created tens of millions of dollars worth of bogus invoices reflecting fictitious sales to alleged customers.[1]  (Compl. at ¶ 23.)  Allou included the receivables from these fictitious sales in its collateral reports, thereby inflating the amount it was permitted to borrow under the Loan Agreement.  Allou also artificially inflated the inventory balance in its collateral reports by engaging in sham purchases from certain affiliated or controlled entities, including Impax Trading Corporation ("Impax") and Evergreen, Inc. ("Evergreen").  (Compl. at ¶ 25.)  Allou allegedly used these entities not only to falsify its records as to purchases but, when these entities were paid for goods that never existed, Impax and Evergreen would recycle the funds back to Allou, thereby providing validation for the cash balances and the accounts receivable set forth in Allou's collateral reports.  (Compl. at ¶¶ 24, 25.)  It is alleged that the Jacobs family attempted to cover up its fraudulent activities by setting fire to Allou's Brooklyn warehouse on September 25, 2002, and by the subsequent attempted bribery of a New York City Fire Marshal.  (Compl. at ¶ 27.)  In connection with the fraud, approximately $58 million was allegedly stolen by the Jacobs and Jacobs-related entities.  (Compl. at ¶ 24.)

On April 9, 2003, shortly after the Allou fraud was uncovered, three of its creditors filed an involuntary Chapter 11 petition against it pursuant to § 303 of the Code.  (Compl. at ¶¶ 9, 28.)  Several members of the Jacobs family were also placed in involuntary bankruptcy on June 30, 2003, and an interim trustee was appointed over the Jacobs' estates on August 7, 2003.  (Compl. at ¶¶ 28-31.)  A trial was held on the appointment of an interim trustee for Allou at which documentary evidence was produced

---

[1] Although the transactions were non-existent, the entities listed on the bogus invoices were actual entities, such as WalMart, Sears, and J.C. Penney.

demonstrating the Jacobs' fraudulent activities and their attempts at a cover-up. (Compl.

at ¶ 29.) The Bankruptcy Court for the Eastern District of New York found that the

Jacobs appeared to have engaged in looting and money laundering, and on September 16,

2003, Allou's Chapter 11 case was converted to Chapter 7 and the Allou Trustee was

appointed. (Compl. at ¶¶ 30-31; Order of May 29, 2003, directing appointment of a

trustee, Case No. 03-82321, Docket No. 121; Order of Sept. 16, 2003, converting

debtors' Chapter 11 cases to Chapter 7 proceedings and authorizing trustee to operate

estate assets, Case No. 03-82321, Docket No. 583.)

## II.    Actrade and its Trade Acceptance Draft Program

Founded in 1987, Actrade provided short-term financing to buyers and sellers of

goods through a Trade Acceptance Draft program (the "TAD Program"). (Compl. at ¶

34.) Instead of buying goods on credit, or issuing a post-dated check, a buyer would

obtain from Actrade and issue to the seller a "Trade Acceptance Draft" ("TAD"), an

instrument (allegedly similar to a check) equal in value to the full amount of the invoice

price for the goods plus Actrade's commission on the transaction. (Compl. at ¶ 36.) The

seller would immediately assign or tender the TAD to Actrade, and Actrade would pay

the seller the invoice amount (the face amount of the TAD less Actrade's commission).

Upon maturity of the TAD, its face amount (including Actrade's commission) would

automatically be debited from the buyer's bank account and deposited into Actrade's

account. *Id.* The typical maturity date for a TAD was one month after payment was

made to the seller. *Id.*

To be eligible to participate in the TAD Program, a potential buyer was required

to execute a Buyer's Acknowledgment Form ("BAF") issued by Actrade, in which the

buyer was required to represent the *bona fides* of the underlying transaction. (Compl. at ¶ 50.) The BAF was drafted by Actrade and was non-negotiable. *Id.* Potential sellers in the TAD Program were required to execute a Seller's Letter of Understanding ("SLU"), also drafted by Actrade and non-negotiable. (Compl. at ¶ 52.)

### III.    The Alleged Wrongdoing at Actrade

The Allou Trustee alleges in the Complaint that while Allou's principals were engaged in a massive fraudulent scheme, there was serious wrongdoing at Actrade as well. The Allou Trustee's allegations of wrongdoing at Actrade are based in large part on allegations made by Actrade shareholders in a 2002 class action suit. As the Allou Trustee describes it, the amended shareholder complaint (the "Shareholder Complaint") includes numerous examples of instances where Actrade facilitated intra-company transactions that (in the view of the Allou Trustee) call into question all of Actrade's TAD transactions. (Compl. at ¶¶ 41, 43.) TADs, it is alleged, were used to disguise risky loans and inter-company money transfers among related entities, and the Shareholder Complaint contains several examples of inter-company money transfers that Actrade assertedly facilitated.[2] The Shareholder Complaint also contains allegations that Actrade engaged in fraudulent lending practices and that it defrauded its surety companies into providing coverage for certain of its losses and engaged in self-dealing for the purpose of inflating its own results. (Shareholder Compl. at ¶¶ 38, 133-78.) Based on these allegations, the Allou Trustee concludes that "contrary to representations to the investing

---

[2] It should be noted, however, that the Allou Trustee does not claim that there is any reference in the Shareholder Complaint to Allou or transactions between Actrade and Allou, Impax or Evergreen. The absence of any reference to Allou is confirmed by the Shareholder Complaint itself; it has been filed with the Court, and the Court can take notice of this document, which is referred to in the Complaint, in connection with this motion to dismiss. *Thomas v. Westchester County Healthcare Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002).

public, Actrade was actually in the business of making high-risk loans (not purchasing

negotiable instruments from sellers) to financially struggling companies." (Compl. at ¶

42.)

Eventually, as the Allou Trustee also alleges, on August 7, 2002, Actrade issued a

public statement announcing the formation of an audit committee to investigate the

allegations of irregularities and improprieties in Actrade's business. (Compl. at ¶ 44.)

On December 12, 2002, Actrade issued a press release that it would file for bankruptcy

protection. (Compl. at ¶ 46.) The press release indicated that allegations against Actrade

involved the legitimacy of "the majority of the domestic [TADs] . . . including, among

other things, the possibility that buyers and sellers in certain domestic TAD transactions

are affiliated with one another." (Compl. at ¶ 46.) The Trustee argues that this

constitutes an admission by Actrade of its allegedly fraudulent activities.

### IV.    The Allou/Actrade Relationship

The Complaint goes into some detail with respect to the transactions involving

both Actrade and Allou. The Allou Trustee alleges that Allou began its dealing with

Actrade in November 1999, and that these dealings continued through January 10, 2003.

(Compl. at ¶ 49.) During that time, Actrade allegedly financed more than $48 million of

TAD transactions where Allou was an ostensible buyer, and Evergreen and Impax were

ostensible sellers. (Compl. at ¶¶ 50-53.) David Shamilzadeh ("Shamilzadeh"), Allou's

secretary and an alleged Jacobs accomplice, executed the BAF on behalf of Allou.

(Compl. at ¶ 50.) The SLUs were assertedly executed by Ari Schwartz ("Schwartz") and

Manny Green ("Green"), respectively, for Impax and Evergreen.[3]  (Compl. at ¶ 54.)  The

Trustee alleges that Impax and Evergreen themselves were companies created solely for

the purpose of assisting the Jacobs family in perpetrating the fraud, and that "many" of

the transactions between Allou, Evergreen and Impax reflected on Allou's books were

fraudulent.  (Compl. at ¶¶ 55-57.)

    The Allou Trustee points to instances of what he alleges were irregularities in the

TAD transactions themselves.  As one example, the Complaint alleges that before the

TADs were payable, Actrade wired funds to Impax or Evergreen, "in some instances on

the very day the TADs were executed and assigned . . . ."  (Compl. at ¶ 65.)  The Allou

Trustee concludes from this (although the basis for this conclusion is not apparent from

the Complaint), "[t]hus, money flowed from Allou to Actrade to Impax and Evergreen."

(Compl. at ¶ 65.)

    The Trustee also alleges that Actrade did nothing to confirm the existence or the

identities of Schwartz and Green, or their authority to act on behalf of the respective

companies, or to determine whether there was a corporate or personal relationship

between Allou, Evergreen and Impax, or to ascertain their creditworthiness.  (Compl. at

¶¶ 58-59.)  Further, the Allou Trustee alleges that certain invoices that Evergreen and

Impax issued and Actrade paid upon under the TAD Program were facially defective, and

that the questionable nature of the invoices should have caused Actrade to recognize that

the sales described therein were fictitious.[4]  (Compl. at ¶¶ 74-83.)  Based on the

---

[3] The Trustee alleges that Schwartz and Green are fictitious, created by the Jacobs in connection with the Allou fraud, and that the signature of Schwartz appears similar to that of Ari Jacobs, son of Allou's Chairman and a co-conspirator in the Allou fraud.  (Compl. at ¶ 55.)

[4] One such invoice, no. 011901, dated around January 24, 2001, concerned a transaction in which Allou allegedly bought and Impax sold four products for $2,192,707.82.  It included two line items for the same product but at different prices per unit, with one price being almost seven dollars more per unit than the

foregoing, the Allou Trustee alleges that Actrade not only knowingly advanced funds against fictitious inventory, but also assisted Allou in concealing the transactions from Allou's creditors, and that "Actrade knew or should have known, the sales by Impax and Evergreen were fictitious." (Compl. at ¶¶ 74, 84-85.)

Finally, the Trustee alleges that Actrade knew that the effect of reporting the fictitious sales to Allou's lenders was to artificially inflate Allou's borrowing base under the Loan Agreement, because Actrade had been provided a copy of the commitment letter for the Loan Agreement. (Compl. at ¶¶ 86-89.) The commitment letter set forth the formula used to determine Allou's borrowing base, therefore allegedly making Actrade aware of the potential result of inflating inventory transactions as between the entities. *Id.* The Trustee claims that Actrade's "extensive dealings" with Allou, Evergreen and Impax and its active participation in the transactions disqualify it from claiming holder in due course status. (Compl. at ¶ 90.)

Based upon the facts alleged in the Complaint, the Allou Trustee asserts six claims for relief against Actrade, all of which assert that the payments from Allou to Actrade were fraudulent conveyances:

---

other. The Allou Trustee alleges that Actrade should have been alerted to the fraud by the price irregularity and that, in addition, more than a year later, on March 20, 2002, Actrade advanced an additional $2,192,707.82 to Impax based on the same invoice, thereby twice advancing funds to pay for the same goods. Similarly on May 10, 2000, Actrade advanced $2,890,796.00 to Impax based on invoice no. 042931. That invoice contained eight line items, two of which represented different sizes of the same type of cologne. The smaller of the two bottles, by .6 ounces, was priced at $4.50 more per bottle than the larger quantity. Then, on March 20, 2002, two years later, Actrade advanced payment on invoice no. 042931 once again.

## I.    Counts One and Five

The Trustee first seeks to recover the payments by Allou to Actrade as intentional fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(A) and DCL § 276.[5]  The Trustee asserts that $8,747,058.50 of the payments were made during the one-year look-back period prior to Allou's filing of its bankruptcy petition and are accordingly avoidable as alleged intentional fraudulent transfers under § 548(a)(1)(A) of the Bankruptcy Code. The remaining payments to Actrade are claimed pursuant to DCL § 276, and attorneys' fees are demanded under DCL § 276-a.

---

[5] Bankruptcy Code § 548(a)(1) provides, in pertinent part:
> The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily – (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

11 U.S.C. § 548(a)(1)(A).

DCL § 276 provides:
> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

N.Y. DEBT. & CRED. § 276.

DCL § 276-a further provides:
> Attorneys' fees in action or special proceeding to set aside a conveyance made with intent to defraud: In an action . . . brought by a . . . trustee in bankruptcy . . . for the benefit of creditors to set aside a conveyance by a debtor, where such conveyance is found to have been made by the debtor and received by the transferee with actual intent, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, in which action . . . the trustee in bankruptcy . . . shall recover judgment, the justice or surrogate presiding at the trial shall fix the reasonable attorney's fees of the trustee in bankruptcy . . . in such action . . . and the . . . trustee in bankruptcy . . . shall have judgment therefor against the debtor and the transferee who are defendants in addition to the other relief granted by the judgment.

N.Y. DEBT. & CRED. § 276-a.

A cause of action under DCL § 276 is substantially similar to that under § 548(a)(1)(A) but has a six-year statute of limitations as opposed to the one-year reach back period provided for under the Bankruptcy Code.  The Trustee's state law rights are accessed via 11 U.S.C. § 544(b).

## II.    Counts Two through Four and Six

The Trustee alternatively seeks to recover the payments made by Allou to Actrade as constructive fraudulent transfers pursuant to 11 U.S.C. § 548(a)(1)(B) and DCL §§ 273-275.[6]  Pursuant to § 548(a)(1)(B), the Trustee asserts that $8,747,058.50 in payments were made without receipt of reasonably equivalent value within one year prior to Allou's filing of its bankruptcy petition at a time when Allou was insolvent.  The Trustee further asserts that pursuant to § 544(b) of the Bankruptcy Code and applicable State law, DCL §§ 273-275, all of the payments from Allou to Actrade were constructive fraudulent transfers because Allou received no consideration for its payments to Actrade; and (i)

---

[6] Bankruptcy Code § 548(a)(1) provides, in pertinent part:

> The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily – (B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a)(1)(B).

DCL § 273 provides:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

N.Y. DEBT. & CRED. § 273.

DCL § 274 provides:

> Conveyances by persons in business: Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

N.Y. DEBT. & CRED. § 274.

DCL § 275 provides:

> Conveyances by a person about to incur debts: Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

N.Y. DEBT. & CRED. § 275.

Allou was insolvent when it made the payments or was thereby rendered insolvent; or (ii)

Allou was engaged or about to engage in a business or transaction for which the property

remaining in its hands after the conveyance constituted unreasonably small capital; or

(iii) at the time Allou made the payments, Allou had incurred, was intending to incur or

believed that it would incur debts beyond its ability to pay as the debts matured.

## **DISCUSSION**

### I.    **Standards on this Motion to Dismiss**

A complaint may not be dismissed under Federal Rule of Civil Procedure

12(b)(6), incorporated herein by Bankruptcy Rule 7012(b)(6), unless it "appears beyond

doubt that the plaintiff can prove no set of facts in support of his claim which would

entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).  The court is

obligated to accept all of the allegations in the complaint as true and to draw all

reasonable inferences in favor of the plaintiff.  *Stuto v. Fleishman,* 164 F.3d 820, 824 (2d

Cir. 1999).  The scope of the court's review is limited, as the "[i]ssue is not whether a

plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to

support the claims." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511 (2002); *Villager

Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir. 1995).  In order to survive a

motion to dismiss, a plaintiff only has to allege sufficient facts, not prove them.  *Koppel

v. 4987 Corp.*, 167 F.3d 125, 133 (2d Cir. 1999).

Actrade has moved to dismiss the Allou Trustee's claims for intentional and

constructive fraudulent transfer on the grounds that the Trustee has not adequately

alleged the elements of such claims under Federal or State law.  Fed. R. Civ. P. 12(b)(6).

It has also asserted that it has an affirmative defense of holder in due course that is dispositive.

Actrade has also moved to dismiss all claims for failure to plead fraud with particularity. Fed. R. Civ. P. 9(b), made applicable to this adversary proceeding by Bankruptcy Rule 7009, provides that "in all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." "The purpose of Rule 9(b) is to protect the defending party's reputation, to discourage meritless accusations, and to provide detailed notice of fraud claims to defending parties." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). To pass muster under Rule 9(b) "a complaint must allege with some specificity the acts constituting fraud . . . conclusory allegations that defendant's conduct was fraudulent or deceptive are not enough." *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings, Ltd.,* 85 F. Supp. 2d 282, 293 (S.D.N.Y. 2000), quoting *Lobatto v. Berney,* 1999 WL 672994, at *9 (S.D.N.Y. Aug. 26, 1999); *White Metal Rolling & Stamping Corp., v. Drew Indus., Inc. (In re White Metal Rolling & Stamping Corp.)*, 222 B.R. 417, 428 (Bankr. S.D.N.Y. 1998).

Rule 9(b) is applicable to claims under § 548(a)(1)(A) of the Bankruptcy Code, as well as to State law claims of intentional fraudulent conveyance under § 276 of the DCL. *Sharp Int'l Corp. v. State Street Bank & Trust Co.*, 403 F.3d 43, 55 (2d Cir. 2005); *Atlanta Shipping Corp. v. Chem. Bank*, 818 F.2d 240, 251 (2d Cir. 1987); *In re Everfresh Beverages, Inc.*, 238 B.R. 558, 581 (Bankr. S.D.N.Y. 1999). The Complaint's compliance with the requirements of Rule 9(b) will accordingly be considered below in connection with the claims of the Complaint that Actrade acted with fraudulent intent

directed at Allou's creditors. *In re Everfresh*, 238 B.R. at 581, citing *Shields*, 25 F.3d at

1127-28; *In re White Metal Rolling & Stamping Corp.*, 222 B.R. at 428.

On the other hand, the great majority of cases hold that since a cause of action

based on constructive fraud does not require proof of fraud, the heightened pleading

requirements of Rule 9(b) are not applicable. See *Sullivan v. Kodsi*, No. 04 Civ. 3994,

2005 WL 736013, at *4 (S.D.N.Y. Mar. 5, 2005); *Spanierman Gallery, PSP v. Love*, 320

F. Supp. 2d 108, 113-14 (S.D.N.Y. 2004); *Intuition Consol. Group, Inc. v. Dick Davis

Publ'g Co.*, No. 03 Civ. 5063, 2004 WL 594651 at *3 (S.D.N.Y. Mar. 25, 2004); *Bank of

Montreal v. Bresner*, No. 92 Civ. 0875, 1992 WL 296438, at *3 (S.D.N.Y. Oct. 8, 1992);

*China Res. Prods. (U.S.A.) Ltd. v. Fayda Int'l, Inc.*, 788 F.Supp. 815, 819 (D. Del. 1992);

*Secs. Inv. Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 319 (Bankr. S.D.N.Y.

1999); *In re White Metal Rolling & Stamping Corp.*, 222 B.R. at 428-29; *contra*, *Gen.

Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1079 (7th Cir. 1997); see

also *Victor v. Riklis*, No. 91 Civ. 2897, 1992 WL 122911, at *5 n.6 (S.D.N.Y. May 15,

1992).

Recently, in *In re Sharp Int'l Corp.*, 403 F.3d at 53, the Second Circuit considered

a motion to dismiss a complaint that asserted claims of constructive and intentional

fraudulent conveyance under New York State law. It held that the intentional fraud

claims had to be pleaded in compliance with Rule 9(b) but did not imply that the

constructive fraud claims had to meet any such requirement. The result is indicative.

Constructive fraudulent conveyance claims do not require proof of fraud or even

wrongdoing. The cause of action is based on the transferor's financial condition, the

value given in exchange for the transfer, and the terms and conditions of the transaction.

*In re White Metal Rolling & Stamping Corp.*, 222 B.R. at 428. The purpose behind Rule 9(b), to protect the defendant's reputation and to guard against strike suits, has little relevance where the claim is not based on any kind of fraud. As the Court in *White Metal* stated, "the sole consideration should be whether, consistent with the requirements of Rule 8(a), the complaint gives the defendant sufficient notice to prepare an answer, frame discovery and defend against the charges." *Id.*; see also *Stratton Oakmont*, 234 B.R. at 319. Rule 9(b) does not apply to the constructive fraud claims and the motion to dismiss such claims on Rule 9(b) grounds is accordingly denied.

With respect to the motion to dismiss the Trustee's remaining claims under Fed. R. Civ. P. 12(b)(6) and 9(b), we deal first with the Trustee's charges that the transfers to Actrade were constructive fraudulent conveyances and Actrade's motion to dismiss these claims under Rule 12(b)(6).

## II.    <u>Constructive Fraudulent Conveyance</u>

Section 548(a)(1)(B) of the Bankruptcy Code permits the trustee to avoid a transfer if he can establish "(1) that the debtor had an interest in property; (2) that a transfer of that interest occurred within one year of the filing of the bankruptcy petition; (3) that the debtor was insolvent at the time of the transfer or became insolvent as a result thereof; and (4) that the debtor received less than a reasonably equivalent value in exchange for such transfer." *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535 (1994). In a similar formulation, New York DCL §§ 273-75 provide that "a conveyance by a debtor is deemed constructively fraudulent if it is made without 'fair consideration,' and if one of the following conditions is met (i) the transferor is insolvent or will be rendered insolvent by the transfer in question . . . (iii) the transferor is engaged or is about to

engage in a business or transaction for which its remaining property constitutes

unreasonably small capital; or (iv) the transferor believes that it will incur debts beyond

its ability to pay." *In re Sharp Int'l Corp.*, 403 F.3d at 53.  DCL § 272 further provides,

in pertinent part, that fair consideration is given for property or an obligation:

> a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
> b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

Under New York law, the party seeking to have the transfer set aside has the burden of

proof on the element of fair consideration and, since it is essential to a finding of fair

consideration, good faith.  *United States v. McCombs*, 30 F.3d 310, 326 (2d Cir. 1994).

The Bankruptcy Code also provides that good faith is relevant in a constructive fraud

case, but unlike New York law, § 548(c) of the Bankruptcy Code "designates the

transferee's good faith as an affirmative defense which may be raised and proved by the

transferee at trial," and the plaintiff need not plead lack of good faith as an element of the

claim itself.  *Gredd v. Bear, Stearns Secs. Corp. (In re Manhattan Inv. Fund, Ltd.)*, 310

B.R. 500, 508 (Bankr. S.D.N.Y. 2002).

In the present case, there is no serious dispute under either Federal or New York

law that Allou had an interest in property - cash - that it conveyed to Actrade.[7]  Likewise,

the Court must accept, for the purposes of this motion to dismiss, that Allou was

insolvent at the time of the transfer.  Solvency or insolvency is ordinarily a question of

fact, *Lawson v. Ford Motor Co. (In re Roblin Indus.)*, 78 F.3d 30, 35 (2d Cir. 1996), and

---

[7] The Trustee alleges that $8,747,058.50 was conveyed within one year of the Petition Date and can be recovered under the Bankruptcy Code.  A total of $48,507,074.95 is at issue under the longer look-back period pursuant to New York State law.

Actrade does not contend Allou's solvency can be established on the basis of the pleadings herein. The principal issue on this motion, as formulated under the Bankruptcy Code, is whether Allou received less than an equivalent value for the transfers made to Actrade; or, as formulated under New York law, whether there was "fair consideration" for the transfers.

Bankruptcy Code § 548(d)(2) defines the term "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor . . .". 11 U.S.C. § 548(d)(2). To determine whether a fair economic exchange has occurred, courts look to the circumstances surrounding the transfer. *Balaber-Strauss v. Lawrence*, 264 B.R. 303, 307-08 (S.D.N.Y. 2001). "Whether a transfer is for reasonably equivalent value is largely a question of fact, the determination of which perforce depends on all the circumstances surrounding the transaction." *American Tissue Inc. v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 351 F. Supp. 2d 79, 105 (S.D.N.Y. 2004), citing *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 466 (S.D.N.Y. 2001). "Value is present if the debtor receives a fair equivalent in exchange for its property or obligation." *Id.* at 308, citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 638 (2d Cir. 1995) *(HBE Leasing Corp. I)*.

Similarly, under New York law, the recipient of the debtor's property provides fair consideration by either conveying property or discharging an antecedent debt, provided that such exchange is a "fair equivalent" of the property received or discharged. *Sharp*, 403 F.3d at 53 n.3. Whether fair consideration has been given in any

17

circumstance is fact-driven, and not subject to any mathematical formula. *McCombs*, 30 F.3d at 326.[8]

Actrade asserts that it gave value to Allou because a debt from Allou to Actrade was created when Actrade paid cash to Impax and Evergreen, and Allou simply discharged its debt when it paid the TAD, a negotiable instrument. The Allou Trustee alleges, on the other hand, that the TAD represented the invoice price of goods (plus Actrade's commission), that Allou received no goods from Impax or Evergreen, and that Allou accordingly received absolutely no value for the cash that it paid out to Actrade. Moreover, according to the Allou Trustee, in some or all of the transactions, "money flowed from Allou to Actrade to Impax and Evergreen." (Compl. at ¶ 65.) Although the Allou Trustee does not support this assertion, and it is inconsistent with other allegations made in the same paragraph of the Complaint, the Allou Trustee alleges in effect that there was no satisfaction of an antecedent debt in any event.

On the present record, Actrade is not entitled to summary dismissal of the Complaint, as questions of fact exist as to whether Actrade provided Allou with "reasonably equivalent value" or a "fair equivalent" of the cash paid when Allou discharged its obligations under the TADs or paid money to Actrade. As is evident from the cases cited above, the question of "reasonably equivalent value" and "fair equivalent" is fact intensive, and usually cannot be determined on the pleadings. Actrade cannot prevail on the bald assertion that it paid cash and its antecedent debt was satisfied. *HBE Leasing Corp. I*, 48 F.3d at 638. On the other hand, the Allou Trustee cannot rest on his

---

[8] Case law indicates that the phrases "reasonably equivalent value" in the Bankruptcy Code and "fair equivalent" as used in the laws of many states can generally be used interchangeably. *Cf. T.F. Stone Co., Inc. v. Harper* (*In re T.F. Stone Co., Inc.*), 72 F.3d 466, 470-71 (5th Cir. 1995), citing *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544 (1994).

position that the Impax and Evergreen transactions were fraudulent and, in his simplistic

formulation, that Allou received nothing.  This is not a case claiming that Actrade should

be held liable in damages for aiding and abetting a crime.  The Allou Trustee is, in the

first instance, following cash, and the issue of fair value in this fraudulent conveyance

case must be analyzed from the perspective of cash that was paid out of Allou and into

Allou.  In other words, it cannot be assumed that the Allou Trustee can use fraudulent

conveyance law to obtain a judgment against Actrade simply by alleging that Allou and

its affiliates were engaged in a fraud that provided no value to Allou.  Putting aside for

the moment the question of good faith, if we credit the allegations of the Complaint that

Impax and Evergreen were mere fronts for Allou, Actrade's payment of cash to Impax

and Evergreen merely recycled the cash back to Allou.

   The foregoing does not ignore the fact that Impax and Evergreen were ostensibly

third parties, and the rule that "[w]hen a debtor transfers its property but the transferee

gives the consideration to a third party, the debtor ordinarily will not have received fair

consideration in exchange for its property." *HBE Leasing Corp. I*, 48 F.3d at 638.

Nevertheless, it is equally well established that the fact that the consideration initially was

paid to a third party affiliate may be disregarded to the extent the debtor indirectly

receives value from the transaction. *Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979,

991-92 (2d Cir. 1981).  The question of indirect value is intensely fact-driven.  "To

determine whether a debtor indirectly received fair consideration under the *Rubin*

doctrine, the fact-finder must first attempt to measure the economic benefit that the

debtor indirectly received from the entire transaction, and then compare that benefit to the

value of the property the debtor transferred." *HBE Leasing Corp. I*, 48 F.3d at 639, citing

*Rubin*, 661 F.2d at 993.  Although these issues cannot be determined on a motion to

dismiss, on the Allou Trustee's theory of the case, Actrade could contend that the only

amounts it received that were not for fair value were its fees and charges above the

amounts that it paid out in cash.[9]

The foregoing discussion of "reasonably equivalent value" and "fair equivalence"

put aside the issue of "good faith."  Under New York law, good faith is an element of fair

consideration, the absence of which the plaintiff must plead and prove.  *McCombs*, 30

F.3d at 326.  Under § 548 of the Bankruptcy Code, good faith is not expressly subsumed

in the definition of reasonably equivalent value.  Moreover, the transferee of an alleged

fraudulent conveyance that takes for value may retain any interest transferred to the

extent the transferee gave value, but only if he acted in good faith.  11 U.S.C. § 548(c).

Under the Bankruptcy Code, § 548(c) "has been construed as an affirmative defense, all

elements of which must be proven by the defendant-transferee."  *Breeden v. L.I. Bridge

Fund, LLC (In re Bennett Funding Group, Inc.)*, 232 B.R. 565, 573 (Bankr. N.D.N.Y.

1999).

Actrade argues that the recent decision of the Second Circuit in *Sharp* is

conclusive in its favor on the issue of good faith.  403 F.3d 43.  In that case the trustee of

a company that had collapsed as a consequence of pervasive insider fraud sued a lender

that had learned of the fraud and had arranged to have its loan repaid from the proceeds

of borrowings by the company from innocent third parties.  The Circuit Court found that

repayment of a valid debt to a lender was not a fraudulent conveyance and affirmed

dismissal of the complaint, even though it was assumed that the lender had discovered

---

[9] On this theory, the Trustee in the original *Ponzi* case used fraudulent conveyance law only to recover the profits of those who had unwittingly aided and abetted the scheme.  See *Lowell v. Brown*, 280 F. 193 (D. Mass. 1922).

that the borrower's operations were fraudulent and that the borrower had obtained the

funds to pay off the existing lender by defrauding new parties. *Id.* at 54-55. The Court

found that the funds borrowed from new parties offset the funds transferred to the

existing lender and that, "[t]he decisive principle in this case is that a mere preference

between creditors does not constitute bad faith." *Id.* at 54. It did not find that the prior

lender whose debt was repaid had acted in good faith, but held that "bad faith does not

appear to be an articulable exception to the broad principle that 'the satisfaction of a

preexisting debt qualifies as fair consideration for a transfer of property.'" *Id.*, quoting

*Pashaian v. Eccelston Props.*, 88 F.3d 77, 85 (2d Cir. 1996). For its holding, the Court

relied strongly on the similar analysis of the First Circuit in *Boston Trading Group v.*

*Burnazos*, 835 F.2d 1504, 1509 (1st Cir. 1987).

Actrade argues that *Sharp* is decisive on the issues in this case and that

application of its reasoning would result in a dismissal of the Complaint.[10] Admittedly,

*Sharp* illustrates the rigor with which the issue of good faith in fraudulent conveyance

claims must be analyzed. The Court there indicated that to establish a lack of good faith

under the DCL, the plaintiff must make an initial showing in the pleadings that the

defendant was not only aware of the fraud but actually participated in it. *Sharp,* 302 B.R.

at 781 (stating that "absent any allegations of [defendant's] participation in the fraud . . .

this knowledge [of the fraud] alone is not sufficient to establish a lack of good faith . . ."

under the DCL). Nevertheless, *Sharp* is not controlling, for at least two reasons.

First, in *Sharp* it was conceded that there was a valid antecedent debt that was

repaid in the alleged fraudulent conveyance. The Circuit Court there found as a critical

---

[10] At the time of the briefing of the motions herein, the Second Circuit had not yet affirmed the decisions
below.

factor that the loan that was repaid "was made in good faith long before the purportedly fraudulent transfer. No ground exists therefore to 'collapse' that loan with other (non-contemporaneous) bad-faith maneuvers." 403 F.3d at 55. The court distinguished its holding in *HBE Leasing Corp. I*, where the Circuit Court stated that "the statutory requirement of 'good faith' is satisfied if the transferee acted without either actual or constructive knowledge of any fraudulent scheme." 48 F.3d at 636. In this case, the Allou Trustee has alleged that the debt repaid to Allou was incurred in connection with transactions that were, at a minimum, irregular. He has thus adequately alleged that Actrade had "actual or constructive knowledge of [a] fraudulent scheme" in connection with the incurrence of the debt. See also *Miller v. Forge Mench P'ship Ltd.*, 2005 WL 267551, at *6 (S.D.N.Y. Feb. 2, 2005).

The second reason why *Sharp* is not controlling is that it construed the New York Debtor and Creditor Law and did not involve claims under § 548 of the Bankruptcy Code. Although the plaintiff must prove lack of "reasonably equivalent value" or "fair consideration" under both statutes, under New York law "good faith" is an integral part of the "fair consideration" factor, and the plaintiff bears the burden of proving lack of fair consideration and by inference lack of good faith. *McCombs*, 30 F.3d at 326. Under the Bankruptcy Code, on the other hand, when the plaintiff demonstrates lack of "reasonably equivalent value," the transferee must prove "good faith" in order to sustain an affirmative defense that entitles him to "retain any interest transferred or . . . enforce any obligation incurred, as the case may be, to the extent that [he] gave value to the debtor in exchange for such transfer or obligation." 11 U.S.C. § 548(c). There are numerous constructive fraudulent conveyance cases brought under the Bankruptcy Code holding

that, in light of § 548(c), the transferee of a fraudulent transfer must prove his good faith in order to sustain his defense and retain the value that he gave. *See, e.g., In re M & L Bus. Mach. Co., Inc.*, 84 F.3d 1330, 1338 (10th Cir. 1996); *In re Bennett Funding Group, Inc.*, 232 B.R. at 572-73; *Burry v. Key Bank USA, N.A. (In re Burry)*, 309 B.R. 130, 135 (Bankr. E.D. Pa. 2004); *Foxmeyer Corp. v. Gen. Elec. Corp. (In re Foxmeyer Corp.)*, 286 B.R. 546, 572 (Bankr. D. Del. 2002); *Lake State Commodities v. Sellis (In re Lake State Commodities)*, 253 B.R. 866, 879 (Bankr. N.D. Ill. 2000). Thus, since the Allou Trustee has raised triable issues of "reasonably equivalent value," it is not his burden, on this motion to dismiss, to overcome Actrade's protestations of good faith.

Actrade also argues that it is a holder in due course of the TADs that it accepted from the sellers and that were then paid by Allou. The Allou Trustee has anticipated Actrade's reliance on this separate defense by alleging in the Complaint that Actrade is not a holder in due course. (Compl. at ¶ 90.) Suffice it to say at this stage of the pleadings that it is not at all clear that the holder in due course defense would be available to afford Actrade substantive rights that it would not have if it were unable to sustain a good faith defense under § 548(c) of the Bankruptcy Code or to counter the Allou Trustee's allegations of bad faith under New York law.

First, it is not clear on this motion to dismiss whether the TAD was a negotiable instrument as to which the holder in due course defense would be applicable. Whether an instrument is a negotiable instrument under the New York Uniform Commercial Code (U.C.C.) is a factual inquiry to be determined on a case by case basis. *Broward Title Co. v. Jacobs (In re AppOnline.com, Inc.)*, 285 B.R. 805, 816 (Bankr. S.D.N.Y. 2002). It cannot be established on the pleadings that the TAD meets the criteria of a negotiable

instrument, namely, that it was signed, contained an unconditional promise to pay, was payable on demand or at a definite time and was payable to order or to bearer. U.C.C. § 3-104. Nor is it clear from the pleadings whether Actrade "dealt with" Allou or with Impax and Evergreen; U.C.C. § 3-305(2) provides that a holder takes free of defenses only if the holder "has not dealt" with such party. *A.I. Trade Finance, Inc. v. Laminaciones de Lesaca, S.A.*, 41 F.3d 830, 838 (2d Cir. 1994). The Complaint contains allegations that Actrade "dealt with" Allou, as well as with Impax and Evergreen, and the issue cannot be determined on this motion to dismiss.

Second, a holder in due course is a "holder who takes the instrument (a) for value; (b) in good faith; and (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person." U.C.C. § 3-302(1). Actrade asserts that it acted in good faith and cites cases under the U.C.C. that hold that bad faith "demands nothing less than actual knowledge of the claim against the instrument or of the facts indicating bad faith in taking the instrument." *Hartford Accident & Indem. Co. v. American Express Co.*, 74 N.Y. 153, 162, 544 N.Y.S.2d 573, 578, 542 N.E.2d 1090, 1095 (1989); *Chem. Bank of Rochester v. Haskell*, 51 N.Y.2d 85, 92-93, 432 N.Y.S.2d 478, 481, 411 N.E.2d 1339, 1342 (1980). Actrade also relies on the principle, embedded in holder in due course law, that the relevant inquiry in the determination whether the holder took for value is whether the holder gave value, not whether the other party received value. *Carrefour U.S.A. Props. Inc. v. 110 Sand Co.*, 918 F.2d 345, 349 (2d Cir. 1990). Citing both of these concepts, Actrade asserts that it has conclusively established its "good faith" and is entitled to an order dismissing the Complaint.

Only one case has been found applying the holder in due course defense in a fraudulent conveyance case, but there the court simply assumed that the defense was available, citing neither statute nor case law to support the proposition. *Thaler v. Lee Servicing Corp.* (*In re Joe Sipala & Son Nursery Corp.*), 214 B.R. 281 (Bankr. E.D.N.Y. 1997). There are arguments for and against reading the concept of "good faith" in § 548(c) of the Bankruptcy Code and in applicable State law *in pari materia* with good faith under § 3-302(1) of the U.C.C. These arguments are well illustrated by *Walsh v. Alpha Fin. Group*, 83 B.R. 8, 12 (B.A.P. 9th Cir. 1987). There the defendant in an action seeking to avoid a post-petition transfer pursuant to § 549 of the Bankruptcy Code asserted that the U.C.C. provisions regarding the rights of a holder in due course should be read as a defense to such action. The Court rejected that argument, stating that § 549 contained no such exception and that "[a]bsent a clearly expressed legislative intent to the contrary, the language of a statute must ordinarily be regarded as conclusive." On the other hand, the Court noted *in dicta* that holder in due course status *might* be appropriately considered in connection with a good faith defense to a § 548 case. 83 B.R. at 13.

There is substantial case law that holds the defendant in a fraudulent transfer case to a higher standard than the U.C.C.; even inquiry notice of the debtor's fraud has in certain cases been sufficient to defeat the good faith defense under § 548(c). *McColley v. Rosenberg (In re Candor Diamond Corp.)*, 76 B.R. at 351, citing *Parker v. Sherman*, 212 F.917 (2d Cir. 1914); see also 4 L. King, COLLIER ON BANKRUPTCY ¶ 548.07[3] (15th ed. 1983). Moreover, there is case law indicating that § 548(c) is the exclusive "method of saving, to the extent of value given, a transfer otherwise invalid under the fraudulent

transfer provisions of the Code." *McColley*, 76 B.R. at 352. "Where Congress explicitly

enumerates certain exceptions to a general prohibition, additional exceptions are not to be

implied, in the absence of contrary legislative intent." *Id.*, citing *McColley v. M.*

*Fabrikant & Sons, Inc. (In re Candor Diamond Corp.)*, 26 B.R. 850, 851.

Suffice it to say that Actrade has not established on this motion to dismiss that it

has a holder in due course defense and that it should apply in the present circumstances.

This is especially so in that the Allou Trustee was under no obligation to rebut this

defense in the Complaint, and his brief anticipation of this defense in ¶ 90 of the

Complaint is surplusage. *Stern v. Gen. Elec. Co.*, 924 F.2d 472, 477 (2d Cir. 1991).

Accordingly, for the reasons stated above, the Court finds that the Complaint

adequately states a claim for constructive fraudulent conveyance under both the

Bankruptcy Code and the DCL.

### III.   Intentional Fraudulent Conveyance

Section 548(a)(1)(A) of the Bankruptcy Code permits the trustee to avoid a

transfer if he can establish: (1) that the debtor had an interest in property; (2) that a

transfer of that interest occurred within one year of the filing of the bankruptcy petition;

and (3) that the transfer was incurred with actual intent to hinder, delay, or defraud

present or future creditors. *Balaber Strauss v. Sixty-five Brokers (In re Churchill*

*Mortgage Inv. Corp.)*, 256 B.R. 664, 675 (Bankr. S.D.N.Y. 2000). Similarly, DCL § 276

provides that "every conveyance made and every obligation incurred with actual intent,

as distinguished from intent presumed at law, to hinder, delay or defraud either present or

future creditors, is fraudulent as to both present and future creditors." If actual intent is

shown, the conveyance under § 276 will be set aside even if fair consideration is given.

*Sharp*, 403 F.3d at 56, citing *McCombs*, 30 F.3d at 328. For the reasons discussed above,

a claim of intentional fraudulent conveyance must be pleaded with particularity. The

issues for purposes of this motion to dismiss under Rule 12(b)(6) are therefore whether

the Allou Trustee has adequately pleaded the element of intent to hinder, delay or defraud

creditors, and whether he has pleaded intent with the requisite particularity.

      Cases under § 548(a)(1)(A) indicate that it is the intent of the transferor and not

the transferee that is relevant for purposes of pleading a claim for intentional fraudulent

conveyance under the Bankruptcy Code. *Plotkin v. Pomona Valley Imports, Inc. (In re*

*Cohen)*, 199 B.R. 709, 717 (B.A.P. 9th Cir. 1996); *In re Churchill Mortgage Inv. Corp.*,

256 B.R. at 675-76; *Martino v. Edison Worldwide Capital (In re Randy)*, 189 B.R. 425,

438 (Bankr. N.D. Ill. 1995); *Universal Clearing House Co. v. Abbott (In re Indep.*

*Clearing House Co.)*, 77 B.R. 843, 860 (D. Utah 1987); *Hayes v. Palm Seedlings*

*Partners-A (In re Agric. Research & Tech. Group, Inc.)*, 916 F.2d 528, 536 (9th Cir.

1990); *Manhattan Inv. Fund, Ltd.*, 310 B.R. at 508. Case law construing New York law

is not entirely clear on this point. In *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1059

n.5 (2d Cir. 1995), the Second Circuit referred only to the intent of the transferor in a case

under § 276. See also, *Stratton Oakmont*, 234 B.R. at 318. Other cases indicate that the

intent of the transferor *and* the transferee must be properly pleaded to state a claim for

relief under DCL § 276. *Sullivan v. Messer (In re Corcoran)*, 246 B.R. 152 (E.D.N.Y.

2000); *Gentry v. Kovler (In re Kovler)*, 249 B.R. 238 (Bankr. S.D.N.Y. 2000); *Manhattan*

*Inv. Fund, Ltd.*, 310 B.R. at 508; *In re Park S. Secs., LLC*, 2005 WL 1389134, at 7-8

(Bankr. S.D.N.Y. Apr. 8, 2005). In *Sharp*, the plaintiff argued that he had adequately

pleaded intent to defraud by alleging with specificity the intent of the transferor – the

insiders who perpetrated the fraud.  *Sharp,* 403 F.3d at 56.  While the *Sharp* Court did not

directly respond to this point, it went on to find that the complaint there was inadequate

because it did not connect the allegations against the defendant to a scheme to defraud

creditors.  The Circuit Court noted that since intent is frequently difficult to prove, the

courts have developed certain badges of fraud to establish the intent of the defendant to

"hinder, delay or defraud" creditors.  It indicated that a lack of specific allegations setting

forth such badges of fraud, or otherwise implicating the defendant in intentional

wrongdoing against creditors, would be fatal to a claim of intentional fraudulent

conveyance.

> Common badges of fraud that give rise to an inference of intent include:
>
> (1) lack or inadequacy of consideration;
> (2) the family, friendship or close associate relationship between the parties;
> (3) the retention of possession, benefit or use of the property in question;
> (4) the financial condition of the party sought to be charged both before and after the transaction in question;
> (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors;
> (6) the general chronology of the events and transactions under inquiry;
> (7) a questionable transfer not in the usual course of business; and
> (8) the secrecy, haste, or unusualness of the transaction.

*HBE Leasing Corp. I*, 48 F.3d at 639; *Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574,

1582-83 (2d Cir 1983); *Wall St. Assocs. v. Brodsky*, 257 A.D.2d at 529, 684 N.Y.S.2d at

247 (1st Dept. 1999).  The existence of a badge of fraud is merely circumstantial

evidence and does not constitute conclusive proof of actual intent.  4 L. King, COLLIER

ON BANKRUPTCY ¶ 548.04[2] (15th ed. 1983).  However, the existence of several badges

of fraud can constitute clear and convincing evidence of actual intent. *Id.* While badges of fraud are not a prerequisite to a finding of actual fraudulent intent, their existence does help to "focus the inquiry on the circumstances that suggest a *conveyance* was made with fraudulent intent, *viz.* with the purpose of placing a debtor's assets out of the reach of creditors." *Sharp* at 784 (emphasis in original).

Although *Sharp* only directly addressed pleading under the DCL, there is no reason why its reasoning should not be applicable to claims of intentional fraudulent conveyance under the Bankruptcy Code as well, especially as the Federal and State statutes are structured similarly, and there is no difference in burden of proof.[11] The key point in *Sharp* is that intentional fraudulent conveyance claims should be relegated to their proper sphere, *i.e.*, where there is a knowing intent on the part of the defendant to damage creditors. This point is as well taken under § 548(a)(1)(A) of the Bankruptcy Code as under § 276 of the DCL.

The Complaint contains few if any "badges of fraud" in its various allegations that Actrade acted to defraud Allou's creditors in connection with the TAD transactions. Importantly, there was no lack of consideration in the transaction, or any familial or other relationship between the parties. There is no allegation that Actrade or Allou retained an interest in the other's business, or that Actrade engaged in transactions with Allou after learning of financial reversals at Allou. There are allegations of questionable transactions not in the ordinary course of business, and that funds were paid prior to the assignment of the TAD. The irregular manner in which the TADs were allegedly paid by Allou may defeat Actrade's holder in due course defense, but this would not give rise to an inference

---

[11] Good faith under § 548(c) is of course a defense to a claim of intentional fraudulent conveyance under § 548(a)(1)(A), as it is to a claim of constructive fraudulent conveyance. The point, however, is what the plaintiff must plead before any defenses need be raised.

that Actrade knowingly participated in a scheme to defraud Allou's creditors.  Nor is

there any allegation of "secrecy, haste, or unusualness of the transaction," which is a

common badge of fraud.  *Kaiser*, 722 F.2d at 1582-83.

The Allou Trustee claims broadly that Actrade helped falsify the collateral

reports, effectively hiding money transfers by accepting wire payments from Allou in

advance of the date on which they regularly came due.  The Trustee fails to explain,

however, why accepting payments in advance and via wire transfer would result in such

payments not being recorded in accounting ledgers, thus avoiding the scrutiny of auditors

for the secured lender.  The Trustee's allegation that Actrade was aware of the terms of

the Loan Agreement likewise does not lead to an inference that Actrade assisted Allou in

inflating its borrowing base and defrauding its secured lender.  Nor does the fact that the

Allou Trustee uncovered several transactions that were irregular justify the conclusion

that Actrade knew or should have known that the inventory that Impax and Evergreen

were allegedly selling to Allou never existed.  There is no allegation that Actrade had

access to any information that was not available to Allou's secured lender.

The Trustee points to allegations made against Actrade as the defendant in a

shareholder lawsuit alleging irregularities and improprieties in its business conduct.  The

crux of the lawsuit, apparently, was that Actrade's "real" business involved making risky

loans, a fact that Actrade allegedly did not disclose to its shareholders.  The Allou

Trustee also alleges that many of the Actrade TAD transactions – and by implication, the

transactions with Allou – facilitated sales between affiliated entities.  Assuming that

Actrade knew or should have known that Allou, Impax and Evergreen were affiliated,

Actrade would not necessarily have had any reason to know of the creation of false

inventory by Allou or a scheme by Allou to defraud its principal lender.  The fact that Actrade misled its own shareholders does not prove that Actrade intended to defraud Allou's creditors, let alone participated in such a fraud.  It only proves that perhaps two separate wrongs occurred around the same time, but it cannot be assumed that a wrongdoer is part of another fraud merely because of his other bad acts.  *Cf.*, *In re Robidoux*, 116 B.R. 320, 325 (D. Mass. 1990); Barry Russell, BANKRUPTCY EVIDENCE MANUAL § 404.2 (2004).

It is recognized that in an intentional fraudulent conveyance case the relevant inquiry is whether the transferee knew of the transferor's intent to defraud his creditors "in any way." *HBE Leasing Corp. I*, 48 F.3d at 636.  The transferee "need not have actual knowledge of *the* scheme that renders the conveyance fraudulent"; constructive knowledge of a scheme to defraud will suffice. *Id.*; see also, *In re Corcoran*, 246 B.R. at 161.  However, the Allou Trustee has failed to allege with sufficient specificity in the Complaint facts that show that Actrade was complicit with or had knowledge of an intentional scheme to defraud creditors of Allou.

On the basis of the foregoing, the Court finds that the Complaint does not plead fraud with the specificity required of a claim of intentional fraudulent conveyance. Nevertheless, the Trustee has informed that Court that additional facts have been revealed in ongoing discovery that bear on Actrade's complicity and more closely tie Actrade to the Allou fraud.  Accordingly, the Allou Trustee may replead in an effort to meet the specificity requirements of pleading under Rule 9(b).

## <u>CONCLUSION</u>

For the reasons set forth above, Actrade's motion to dismiss the Trustee's claims of constructive fraudulent conveyance is denied.  Actrade's motion to dismiss the Allou Trustee's claims of intentional fraudulent conveyance is granted, with leave to the Allou Trustee to replead.  Actrade shall settle an appropriate order on five business days' notice.

Dated:  New York, New York
            June 23, 2005

_____*/s/ Allan L. Gropper*_____
UNITED STATES BANKRUPTCY JUDGE